UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

JEROME W. DEWALD, pro se

**22 CV 08210**

                    Plaintiff,                    NO:

-against-                                         **COMPLAINT**

THE CITY OF NEW YORK, THE NEW
YORK TRANSPORTATION DEPARTMENT,
THE NEW YORK POLICE DEPARTMENT,
THE NEW YORK PARKS AND
RECREATION DEPARTMENT, THE
CENTRAL PARKS CONSERVANCY,

ERIC ADAMS, in his official capacity as
Mayor of the City of New York, and

YDANIS RODRIGUEZ, in his official capacity
as Commissioner of the New York City
Department of Transportation, and

KEECHANT SEWELL, in her official capacity
as Commissioner of the New York City Police
Department, and

SUE DONOGHUE, in her official capacity as
Commissioner of the New York City
Department of Parks & Recreation, and

ELIZABETH SMITH, in her official capacity
as President of the Central Park Conservancy.

                    Defendants.

## INTRODUCTION

1.     This lawsuit seeks to end discrimination and harm committed by the City of

New York ("the City"), its Mayor, its Departments of Transportation, Police, and Parks and

Recreation ("Parks"), and those Department's Commissioners, and the Central Parks

Conservancy (collectively "Defendants") against elderly and disabled pedestrians and

school children on Central Park's roadways by the City's failure to control vehicular traffic

1

moving through its pedestrian crosswalks.

2. Central Park has 41 pedestrian crosswalks with pedestrian signals. One of those crosswalks is located on West Drive at the 63rd Street entrance and is within 350 feet of two schools: a) the YMCA and b) the Ethical Culture Fieldston School.

3. This crosswalk is used by numerous disabled persons of all ages, including students from these schools, children, babies, adults, and elderly who live or are cared-for nearby and those who travel to New York City as tourists and desire to enjoy the pleasures of New York's Central Park.

4. Plaintiff is a disabled American under the Americans with Disabilities Act.

5. To the disabled, elderly, and young children, Central Park roadway crossings are dramatically less safe & more difficult to navigate than those on NYC streets.

6. New York City streets are alive with sounds, but vehicles in the roadways in Central Park consist of essential vehicles, horse-drawn carriages, pedicabs, racing bicycles, and various other quiet vehicles, including a wide variety of battery-operated one and two-wheeled vehicles and road-licensed motor cycles in addition to manual and electric commuter, tourist, and delivery bicycles.

7. Blind and visually-disabled pedestrians must listen for oncoming traffic in order to avoid it. This traffic is nearly impossible to hear except for the horse-drawn carriages and emergency vehicles.

8. Many of these vehicles operate on the Central Park roadways at more than twice the posted speed limit of 20 MPH.

9. Virtually none of these vehicles stop, or even slow down, at crosswalks

when there is a red stop light for vehicles and pedestrians are trying to cross. For example, on the Saturday of Labor Day 2022, at the crosswalk cited above, an average of over 130 non-motorized vehicles ran the red light every hour during a busy three-hour period from 1:53 PM to 4:53 PM, when pedestrians were present almost all of the time (see Exhibit A).

10.     Many of these vehicles cross into the jogger lane in order to speed through the crosswalks in Central Park, which frightens, endangers, and assaults disabled & elderly pedestrians in the crosswalk as well as those using the jogger lane. Those in the jogger lane often include disabled and elderly using the jogger lane for exercise and recreation.

11.     The jogger lane is the innermost (nearest the center of the park) lane on the roadway and is designed to carry only walking and running pedestrian traffic in two directions. The one-way outermost 2 lanes are for essential motorized-vehicles while the one-way center lane is for bicycles and other non-motorized vehicles. Thus, the roadway is designed to carry all vehicular traffic in one direction, while carrying jogging and walking pedestrians in two directions.

12.     There are no physical barriers between these three streams of traffic, allowing traffic from any lane to freely move into a different lane, even if the destination lane moves in a different direction than the origin lane.

13.     Twenty-three non-motorized vehicles crossed into the oncoming jogger lane in order to illegally run the red light in this same crosswalk during this same busy three-hour period on the Saturday of Labor Day 2022 (see Exhibit A).

14.     It is common for vehicles to operate in the wrong direction in the Central Park roadways, further frightening, endangering and assaulting disabled and elderly in the

crosswalks and the jogger lanes in Central Park (see Exhibit A).

15.     There is absolutely no enforcement of the traffic rules on the roadways in ~~Central Park. NYPD has abandoned this part of its charter in Central Park.~~

16.     The roadways in Central Park are poorly designed for the traffic carried. The design of these roadways contributes to the chaos in the roadways. For example, there are no signs in the roadway that would indicate to a wrong-way driver that he/she is going the wrong way. There is no physical separation between lanes with one-way traffic carrying vehicles and lanes with two-way traffic carrying joggers and walking pedestrians. The timing of crossing signals is random the vast majority of the time, impeding the smooth flow of vehicular traffic operating at the speed limit.

17.     When confronted with the fact that no one is utilizing the signals in the park – the cyclists are not stopping at the red light and the pedestrians are crossing against the walk signal, NY DOT's Commissioner's Customer Service and Correspondence Unit's written reply on July 13, 2022, was: "There isn't anything that is going to stop this from happening now that the park is car-free. … I don't believe there is a design solution for this…" (see Exhibit B). NY DOT has abandoned this part of its charter in Central Park.

18.     Central Park Conservancy (CPC) does little to educate drivers regarding the rules for bicycles in the park. CPC fails to ensure that barriers and warning signs designed to protect disabled and elderly pedestrians in crosswalks are placed back into the roadway in a timely fashion after being removed for events that are held in the park's roadways, like running and cycling events. CPC has abandoned this part of its charter in Central Park.

19.     The City of New York, including its departments NYPD, NY DOT, and

NYC Parks does nothing to police its own drivers in Central Park. These drivers speed through the crosswalks and fail to stop at red lights in the crosswalks at rates comparable to drivers of non-municipal vehicles and other vehicles. The City of New York has abandoned this part of its charter in Central Park.

20.     The City's consistent failure to control the vehicular traffic moving through the crosswalks in Central Park through its various municipal departments and partnerships, including NYPD, NY DOT, NY Parks, and the Central Park Conservancy violates Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the New York City Human Rights Law.

21.     Plaintiff sues on behalf of himself because he is a disabled American being discriminated against and subjected to hazardous conditions on Central Park roadways and denied access to Central Park as a result.

22.     Plaintiff brings to this Court's attention that these violations affect a very large class of Plaintiffs.

**JURISDICTION**

23.     This is an action for declaratory and injunctive relief, brought pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

24.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 for claims arising under the ADA and Section 504, and supplemental jurisdiction over the NYCHRL claims pursuant to 28 U.S.C. § 1367.

25.     This Court has authority to issue a declaratory judgment pursuant to 28

U.S.C. §§ 2201 and 2202.

**VENUE**

26.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District.  The

Defendants are located within this District and a substantial part of the events or omissions

giving rise to the claims alleged herein occurred in this District.

**PARTIES**

27.     Plaintiff Jerome W. Dewald is an elderly survivor of stage 4 throat cancer.

He lives in the borough of Manhattan, New York City, and is retired.  He is a pedestrian

primarily in the Upper West Side of Manhattan.  He is a qualified individual with a

disability within the meaning of all applicable statutes.

28.     Defendants the City of New York and its Police Department, Department of

Transportation, and Department of Parks and Recreation, as defined by the laws of the City

of New York, are "public entities" within the meaning of Title II of the ADA, as that term is

defined under 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

29.     Defendants the City of New York, its Police Department, Department of

Transportation, and Department of Parks and Recreation, are also recipients of federal

funds, subject to the accessibility requirements of Section 504 of the Rehabilitation Act.

30.     Defendants the City of New York and its Department of Transportation are

the public entities responsible for installing, repairing, and maintaining all pedestrian rights-

of-way along New York City sidewalks and crosswalks, including those in Central Park.

31.     Defendant Adams, sued in his official capacity, is the Mayor of the City of

New York. Under the New York City Charter, the Mayor is "responsible for the effectiveness

and integrity of city government operations and shall establish and maintain such policies

6

and procedures as are necessary and appropriate to accomplish this responsibility including the implementation of effective systems of internal control by each agency and unit under the jurisdiction of the mayor." N.Y.C. Charter § 8(a).

32.    Defendant Rodriguez, sued in his official capacity, is the Commissioner of the Department of Transportation. Under the New York City Charter, the Commissioner of the Department of Transportation is charged, *inter alia*, with establishing, determining, controlling, installing and maintaining the design, type, size and location of any and all signs, signals, marking, and similar devices indicating the names of the streets and other public places and for guiding, directing or otherwise regulating and controlling vehicular and pedestrian traffic in the streets, squares, parks, parkways, highways, roads, alleys, marginal streets, bridges and other public ways of the city. N.Y.C. Charter § 2903(a)(2).

33.    Defendant Sewell, sued in her official capacity, is the Commissioner of the New York City Police Department. Under the New York City Charter, the New York City Police Commissioner is charged, *inter alia*, with regulating, directing, controlling, and restricting the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health.

34.    Defendant Donoghue, sued in her official capacity, is the Commissioner of the New York City Parks and Recreation Department. Under the New York City Charter, the Commissioner of the New York City Parks and Recreation Department is charged, *inter alia*, with authorizing and regulating the use of and the projections on and determining the line or curb and surface construction of all streets and avenues lying within any park, square or public place or within a distance of 350 feet from the outer boundaries thereof.

35.    Defendant Smith, sued in her official capacity, is the President of the Central

Park Conservancy. Central Park Conservancy is a public-private partnership with the City of

New York. The Conservancy's President reports to the NYC Parks Commissioner. The

Conservancy is responsible, *inter alia*, for oversight of safety, roads and lighting, permits,

and rules and regulations in Central Park.

## **FACTUAL BACKGROUND**

36.      Central Park is arguably the crown jewel of New York City. It has been a

National Historic Landmark since 1963. According to Wikipedia, it is the most visited urban

park in the United States, with an estimated 42 million visitors annually as of 2016. Millions

of these visitors are disabled.

37.      West Drive is the westernmost of the park's vertical "drives". Together with

the horizontal Center Drive, which connects West Drive to East Drive at the southernmost

end of Central Park, these three "drives" form a loop around the entire perimeter of Central

Park, with the horizontal Terrace Drive forming a smaller "lower loop" (see Exhibit C).

38.      In order to enter Central Park in any meaningful way, disabled pedestrians

must cross one of these "drives" by using a pedestrian crosswalk.

39.      There are 41 pedestrian crossings with pedestrian signals in the park.

40.      West Drive, which carries southbound bicycle and horse-carriage traffic,

pedicabs and various battery-operated and essential motor vehicles, winds through the

western part of Central Park, connecting Lenox Avenue/Central Park North with Seventh

Avenue/Central Park South and Central Drive.

41.      In 2014, a 0.5-mile (0.80 km) stretch of West Drive was considered to be "the

most dangerous section of Central Park" for pedestrians, with bicycle crashes along the drive

leaving 15 people injured, according to the New York Post (see Exhibit D).

42.     The roadway design and the vehicular traffic carried by the roadway and these "drives" changed dramatically when non-essential motor vehicles were finally banned completely from Central Park roadways in 2018.

43.     Prior to that, the roadway was intended to be used by normal, everyday motorized-vehicle traffic in a public park: a) the speed limit was 25 MPH; b) the lights at pedestrian crossings were timed so that a car traveling at the speed limit could successfully navigate the lower loop in its entirety without stopping.

44.     After the roadway closed in 2018, the pedestrian signals were switched from the timed-to-25-MPH regime to a mostly manually-operated regime and the speed limit reduced to 20 MPH.

45.     This means that the pedestrian signal light timing today is random most of the time, contributing to the chaos on the roadway.

46.     These crosswalks are dangerous to disabled pedestrians.

47.     In 2011, residents of nearby communities unsuccessfully petitioned the NYPD to increase enforcement of cycling rules within the park because of these dangers, according to an article in The Gothamist.

48.     Three years later, in 2014, a pedestrian, Jill Tarlov, 59, was struck by a bicycle and killed in the crosswalk cited in paragraph 2 above. The cyclist swerved to avoid a group of tourists in crosswalk and hit Ms. Tarlov instead according to the New York Post (see Exhibit E).

49.     Retired physics teacher Irving Schachter, 75, also died on the Central Park roadways in 2014, after he was hit from behind by a cyclist who swerved into the jogger lane trying to dodge a pedicab on East Park drive near 72nd Street (see Exhibit F).

50.     By 2021, the advent of small one and two-wheeled EVs (electrical vehicles) further altered the nature of vehicular traffic on Central Park roadways and its crosswalks.

51.     Between May 24, 2022, and Labor Day, September 5, 2022, Plaintiff recorded over 2,700 video clips of the behavior of vehicles, pedestrians, and enforcement activity in the Central Park crosswalk noted in paragraph 2 above. These video clips range in length from a few seconds to more than 3 continuous hours and include activity in the crosswalk at different times of the day virtually every day during this 16-week period, totaling over 140 hours of video and providing an extensive body of evidence supporting this complaint.

52.     A 3-hour video survey of this crosswalk on Saturday September 4, 2022 (Saturday before Labor Day 2022) shows numerous battery-operated and motorized two and one-wheel vehicles, many with passengers and baggage, traveling through this crosswalk well above the speed limit while disabled pedestrians are in the crosswalk, attempting to enter Central Park. This is typical vehicle behavior in this crosswalk.

53.     The same video survey shows 391 non-motor vehicles failing to obey a traffic control device in this crosswalk, in other words, "running the red light", while disabled pedestrians are in the crosswalk.

54.     Twenty-three non-motor vehicles crossed into the oncoming "jogger" lane in the roadway, for the purpose of running the red light.

55.     As a result, disabled pedestrians attempting to enter Central Park using the pedestrian crosswalks are terrified and bewildered by the chaos on Central Park roadways and therefore fundamentally denied access to Central Park.

56.     This is the backdrop for the current action. The out-of-control situation on

Central Park roadways prevents meaningful access to Central Park for disabled persons and

violates the Americans with Disabilities Act.

## PLAINTIFF'S ALLEGATIONS

### A. Harm to Plaintiff

57.     Plaintiff Jerome W. Dewald resides in the Upper West Side of Manhattan

within one block of Central Park and the crosswalk identified in paragraph 2 above.

58.     Mr. Dewald is over 71 years old and retired.

59.     Mr. Dewald is a survivor of stage 4 throat cancer and has lost the partial use

of his right arm, as well as his visual acuity.

60.     The most direct way for Mr. Dewald to enter Central Park is by using the

crosswalk a the 63rd Street entrance, the same one identified in paragraph 2 above.

61.     Mr. Dewald has experienced and continues to experience barriers to

enjoying the pleasures of Central Park because of Defendants' continuous violations of

disability access laws.

62.     Mr. Dewald wants to and intends to continue to enjoy the pleasures of

Central Park.

63.     These injuries would be directly redressed by a favorable decision in this case.

## CLASS ALLEGATIONS

64.     Notwithstanding plaintiff's pro se status, pursuant to Rule 23(b)(2) of the

Federal Rules of Civil Procedure, a qualified Plaintiff may bring this action, for injunctive and

declaratory relief purposes, on their own behalf and on behalf of all persons similarly situated.

65.     The class that a qualified Plaintiff would represent includes all persons with

disabilities who use or will use Central Park pedestrian street crossings to enter and exit the park.

66.     About 1,000,000 residents of New York City, 11% of the population, have disabilities. Of the 45 million visitors to Central Park every year, several million have disabilities.

67.     The persons in the class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court.  The class includes all persons with disabilities who use or will use Central Park's pedestrian street crossings.

68.     There is a well-defined community of interest in the questions of law and fact affecting the parties to be represented in that they are all being denied, or will be denied, their civil rights and meaningful access to Central Park's pedestrian street crossings, due to the uncontrolled vehicular traffic therein.

69.     Common questions of law and fact predominate, including questions raised by Plaintiff's allegations that by failing to control vehicular traffic flowing through Central Park's crosswalks, Defendants have failed to provide meaningful access to its pedestrian street crossings to persons with disabilities in violation of Title II of the ADA and Section 504.  The common questions raised by Plaintiff are capable of class-wide resolution.

70.     Plaintiff's claims are typical of the claims of the class as a whole because the Plaintiff is similarly affected by Defendants' failure to provide meaningful access to Central Park's signaled pedestrian street crossings.

71.     Defendants have acted and/or failed to act on grounds generally applicable to all class members, thereby making final declaratory and injunctive relief with respect to the

12

class as a whole appropriate.

## CAUSES OF ACTION

### Count I
### Discrimination in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.

72.     Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the Complaint.

73.     Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, prohibits a public entity from excluding a person with a disability from participating in, or otherwise benefitting from, a program of the public entity, or otherwise discriminating against a person on the basis of disability:  "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

74.     The term "disability" includes physical and mental impairments that substantially limit one or more major life activities.  42 U.S.C. § 12102(2).

75.     A 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

76.     Plaintiff is a person with disabilities within the meaning of the statute in that he has impairments which substantially limit the major life activity of seeing, speaking, and moving is right arm.  He is also qualified in that he is located in New York City and thus is

13

eligible to benefit regularly from recreation in Central Park. Thus, Plaintiff is a qualified

individual with disabilities within the meaning of 42 U.S.C. §§ 12102 and 12131 and 28

C.F.R. § 35.104.

77.     A "public entity" includes state and local governments, their agencies, and

their instrumentalities. 42 U.S.C. § 12131(1). Defendants are public entities within the

meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

78.     Congress directed the Department of Justice ("DOJ") to write regulations

implementing Title II's prohibition against discrimination. 42 U.S.C. § 12134. Pursuant to

this mandate, the DOJ has issued regulations defining the forms of discrimination prohibited

by Title II of the ADA. 28 C.F.R. § 35.101 *et seq.*

79.     Title II of the ADA requires public entities, including Defendants, to operate

each of their programs, services or activities "so that, when viewed in its entirety, it is readily

accessible to and useable by individuals with disabilities." 28 C.F.R. § 35.150; *see also* 28

C.F.R. §§ 35.149, 35.151.

80.     Title II of the ADA requires public entities, including Defendants, to design

and construct their new facilities so that "[e]ach facility or part of a facility . . . is readily

accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(a)(1).

81.     Title II of the ADA requires that where public entities, including Defendants,

alter their existing facilities, like roadway design, in a manner that affects or could affect the

usability of the facility after 1992, these "shall, to the maximum extent feasible, be altered in

such manner that the altered portion of the facility is readily accessible to and usable by

individuals with disabilities." 28 C.F.R. § 35.151(b)(1).

82.     New York City's Central Park pedestrian street crossings constitute a

program, service or activity under Title II of the ADA.

83.     Defendants have failed to provide people with disabilities meaningful access

~~to Central Park in violation of Title II of the ADA.  Defendants have also failed to operate the~~

pedestrian roadway crossings in Central Park so that they are readily accessible and usable

by disabled people when viewed in their entirety, in violation of Title II of the ADA.

84.     Defendants are currently denying qualified individuals with disabilities the

opportunity to participate in or benefit from Central Park; affording individuals with

disabilities an opportunity to participate in Central Park that is not equal to others; and/or

providing individuals with disabilities with an aid, benefit, or service that is not as effective

in affording equal opportunity to obtain the same result or to gain the same benefit from

Central Park as that provided to others, in violation of 28 C.F.R. § 35.130(b)(1)(i)- (iii).

85.     Defendants, directly and/or through contractual or other arrangements, utilize

criteria and/or methods of administration that have the effect of subjecting qualified

individuals with disabilities to discrimination on the basis of their disability and defeat or

substantially impair the accomplishment of the objectives of Central Park crosswalks with

respect to individuals with disabilities, in violation of 28 C.F.R. §35.130(b)(3)(i)–(ii).

86.     Defendants have failed to make reasonable modifications in their policies,

practices, or procedures necessary to avoid discrimination on the basis of disability, in

violation of 28 C.F.R. § 35.130(b)(7).

87.     Defendants have failed to maintain the features of all facilities required to be

accessible under the ADA.  28 C.F.R. § 35.133.  Facilities required to be accessible include

buildings, structures, or sites where the facilities are located.  *See* 28 C.F.R. § 35.104.

88.     Defendants have failed to enforce existing traffic regulations so that use of

crosswalks in Central Park are as effective for people with disabilities as they are for others, and have failed to provide necessary auxiliary aids and services enabling the disabled an ~~equal opportunity to participate in, and enjoy the benefits of Central Park, in violation of 28~~ C.F.R. § 35.160.

89.    As a direct and proximate result of the aforementioned acts, Plaintiff has been and continues to be injured.

90.    Defendants' conduct constitutes an ongoing and continuous violation of Title II of the ADA and, as a result, Plaintiff is entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs.

## Count II
### Disability Discrimination in Violation of Section 504 of the Rehabilitation Act

91.    Plaintiff re-alleges and incorporates all previously alleged paragraphs.

92.    Section 504 mandates that "[n]o otherwise qualified individual with a disability ... shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

93.    An "individual with a disability" is defined under the statute, in pertinent part, as an "individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(2)(B) (referencing 42 U.S.C. § 12102). A "qualified" disabled person means a person who meets the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity. 28 C.F.R. § 39.103.

94.    For the reasons set forth above, Plaintiff is a person with disabilities within the meaning of the statute who are qualified to benefit from Central Park.

95.    Defendants' acts and omissions described herein violate the equal access and nondiscrimination provisions of Section 504 and the regulations promulgated thereunder, and have resulted in injury to Plaintiff.

96.    This conduct, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

97.    Plaintiff is entitled to injunctive relief and reasonable attorneys' fees, expenses, and costs, pursuant to 29 U.S.C § 794(a).

**Count III**
**Disability Discrimination in Violation of the New York City Human Rights Law**

98.    Plaintiff re-alleges and incorporates herein all previously alleged paragraphs.

99.    The New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8- 107(4)(a) provides, "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . . disability . . . of any person directly or indirectly, to refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation"

100.    The term "person" in the NYCHRL includes "governmental bodies or agencies." N.Y.C. Admin. Code § 8-102(a).

101.    The NYCHRL defines the term "place or provider of public accommodation" to include "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kinds are extended, offered, sold or otherwise made available." N.Y.C. Admin. Code §

8-102(9).

102.    Central Park is a public accommodation within the meaning of the NYCHRL.

103.    Through the actions described above, the City has denied to disabled people

full and equal enjoyment, on equal terms and conditions, access to Central Park.

104.    The NYCHRL additionally requires that any person prohibited from

discriminating under Section 8-107 on the basis of disability "shall make reasonable

accommodation to enable a person with a disability to . . . enjoy the right or rights in

question provided that the disability is known or should have been known by the covered

entity." N.Y.C. Administrative Code § 8-107(15).  The term "covered entity" is defined as a

person required to comply with any provision of Section 8-107, which includes Defendants

under the N.Y.C. Admin. Code § 8-102(1).

105.    Adequate roadway design and enforcement of the traffic rules constitute a

reasonable accommodation under the NYCHRL.

106.    Defendants have been aware of the need to redesign the roadways in Central

Park since at least 2010.

107.    Defendants have made inadequate or no reasonable accommodations to allow

people who are disabled the opportunity to safely use crosswalks in Central Park.

108.    Defendants' conduct also violates N.Y.C. Administrative  Code § 8-107(17),

which states that "an unlawful discriminatory practice . . . is established . . . [when plaintiff]

demonstrates that a policy or practice of a covered entity or a group of policies or practices of

a covered entity results in a disparate impact to the detriment of any group protected by the

provisions of this chapter."

109.    Defendants' policy or practice of failing to redesign the roadway and failing

to enforce the traffic rules has a disparate negative impact on disabled pedestrians seeking to use Central Park.

~~110.    As a direct and proximate result of Defendants' violations of the NYCHRL,~~ Plaintiff has been injured as set forth herein.

111.    This conduct, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

112.    Consequently, Plaintiff is entitled to injunctive relief and reasonable attorneys' fees and costs.

**Count IV**
**Declaratory Relief**

113.    Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the Complaint.

114.    Plaintiff contends that Defendants have failed and are failing to comply with applicable laws prohibiting discrimination against persons with disabilities in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the NYCHRL, N.Y.C. Admin. Code § 8-107 *et seq.*

115.    Plaintiff contends, and is informed and believes, that Defendants deny failing to comply with applicable laws prohibiting discrimination against persons with disabilities.

116.    A judicial declaration is necessary and appropriate at this time in order that the parties may know their respective rights and duties and act accordingly.

**PRAYER FOR RELIEF**

117.    WHEREFORE, Plaintiff prays that this Court:

118.    Declare that the actions and inactions described herein violate the rights of Plaintiff under the ADA, Section 504, and the NYCHRL;

119.    Issue an order requiring that Defendants take the necessary steps to remedy Central Park's pedestrian crosswalks so that its signaled pedestrian street crossings are fully ~~accessible to people who are disabled in compliance with the ADA, Section 504, and the~~ NYCHRL;

120.    Issue an order enjoining Defendants from continuing to engage in the unlawful conduct of a) failing to enforce the vehicular traffic rules in Central Park, including prohibited vehicles, excessive speed, failing to stop at the red light in a pedestrian crossing, vehicles crossing into the oncoming jogger lane, and vehicles going the wrong way in the roadway, and b) failing to redesign the roadway to accommodate the lack of motor vehicles and prevalence of two and one-wheeled battery-powered vehicles and bicycles, both tourist and racing;

121.    Issue an order requiring that Defendants close the roadways in Central Park to all but essential vehicles until an acceptable remediation plan can be adopted;

122.    Award reasonable attorneys' fees and costs; and

123.    Grant such other and further relief as the court deems just and proper.

Dated: September 26, 2022       Respectfully submitted
New York, New York

Jerome W. Dewald, *pro se*
30 W. 63rd St, Apt 8V
New York, NY 10023
Tel: (212) 365-8451
Email: jeromekjerome@gmail.com

# Exhibit A

## SURVEILLANCE STATISTICS

### WEST DRIVE/63RD ST ENTRANCE CROSSWALK

**9/4/2022**

**1:53 PM – 4:53 PM**

# SURVEILLANCE STATISTICS

## WEST DRIVE/63RD ST ENTRANCE CROSSWALK

| FIRST HOUR | 9/4/2022 | 1:53 | PM | RED LIGHT | JOGGER LN | PEDICABS | WRONG WAY | NOTES |
|---|---|---|---|---|---|---|---|---|
| 1ST RED | 1:40 | 1:54 | PM | 7 | 9 | 1 | | VIDEO AVAIL |
| 2ND RED | 4:50 | 1:57 | PM | 9 | 0 | 1 | | VIDEO AVAIL |
| 3RD RED | 10:39 | 2.03 | PM | 14 | 0 | 0 | | VIDEO AVAIL |
| 4TH RED | 12:52 | 2:05 | PM | 3 | 2 | 0 | | VIDEO AVAIL |
| 5TH RED | 16:53 | 2:09 | PM | 3 | 2 | 1 | | VIDEO AVAIL |
| 6TH RED | 22:18 | 2:15 | PM | 7 | 0 | 1 | | VIDEO AVAIL |
| 7TH RED | 24:41 | 2:17 | PM | 6 | 0 | 0 | | VIDEO AVAIL |
| 8TH RED | 27:16 | 2:20 | PM | 8 | 3 | 1 | | VIDEO AVAIL |
| 9TH RED | 34:221 | 2:27 | PM | 6 | 2 | 0 | | VIDEO AVAIL |
| 10TH RED | 36:29 | 2:29 | PM | 1 | 0 | 0 | | VIDEO AVAIL |
| 11TH RED | 40:49 | 2:33 | PM | 0 | 0 | 0 | | NYPD, VIDEO AVAIL |
| 12TH RED | 43:40 | 2:36 | PM | 0 | 0 | 0 | | NYPD, VIDEO AVAIL |
| 13TH RED | 47:36 | 2:37 | PM | 5 | 0 | 0 | | NYPD, VIDEO AVAIL |
| 14TH RED | 51:35 | 2:41 | PM | 0 | 0 | 0 | | NYPD, VIDEO AVAIL |
| 15TH RED | 53:57 | 2:43 | PM | 2 | 0 | 0 | | NYPD, VIDEO AVAIL |
| 16TH RED | 56:58 | 2:46 | PM | 3 | 1 | 0 | | NYPD, VIDEO AVAIL |
| 17TH RED | 57:55 | 2:47 | PM | 4 | 0 | 0 | 1 | NYPD, VIDEO AVAIL |
| | | | PM | RED LIGHT | JOGGER LN | PEDICABS | WRONG WAY | NOTES |
| | | | | 78 | 19 | 5 | 1 | ONLY WHILE RED LIGHT |

| RUNNING RED LIGHT ONLY | | 78 | | |
|---|---|---|---|---|
| FAILURE TO OBEY TRAFFIC | | $190 | 1ST OFFENSE | |
| CONTROL DEVICE | | $14,820 | REV/HR | NYPD PRESENT 15 MIN |

| SWERVING INTO JOGGER LANE | | 19 | | |
|---|---|---|---|---|
| FAILURE TO USE AND/OR RIDE | $ | 115 | 1ST OFFENSE | |
| WITHIN AVAILABLE BIKE LANES | $ | 2,185 | REV/HR | |

| WRONG WAY THRU CROSSWALK | | 1 | | |
|---|---|---|---|---|
| WRONG WAY | $ | 243 | 1ST OFFENSE | |
| | $ | 243 | REV/HR | |

| | TOTAL | $ 17,248 | REV/HR | 3 OFFENSES | NYPD PRESENT 15 MIN |
|---|---|---|---|---|---|

# SURVEILLANCE STATISTICS

## WEST DRIVE/63RD ST ENTRANCE CROSSWALK

| SECOND HOU 9/4/2022 | 1:53+6( PM | | | RED LIGHT | JOGGER LN | PEDICABS | WRONG WAY | NOTES |
|---|---|---|---|---|---|---|---|---|
| 1ST RED | 1:03:09 | 2:56 | PM | 0 | 0 | 0 | 0 | NYPD, VIDEO AVAIL |
| 2ND RED | 1:08:48 | 3:01 | PM | 14 | 0 | 0 | 0 | KYD, VIDEO AVAIL |
| 3RD RED | 1:10:08 | 3:03 | PM | 8 | 0 | 0 | | VIDEO AVAIL |
| 4TH RED | 1:14:20 | 3:07 | PM | 10 | 0 | 0 | | 2 CARRIAGES, VIDEO AVAIL |
| 5TH RED | 1:16:15 | 3:09 | PM | 4 | 0 | 0 | | VIDEO AVAIL |
| 6TH RED | 1:19:30 | 3:12 | PM | 17 | 0 | 3 | | VIDEO AVAIL |
| 7TH RED | 1:22:28 | 3:15 | PM | 17 | 1 | 0 | | VIDEO AVAIL |
| 8TH RED | 1:23:32 | 3:16 | PM | 8 | 0 | 0 | | VIDEO AVAIL |
| 9TH RED | 1:26:50 | 3:19 | PM | 8 | 1 | 0 | | VIDEO AVAIL |
| 10TH RED | 1:28:24 | 3:21 | PM | 4 | 1 | 0 | | VIDEO AVAIL |
| 11TH RED | 1:32:20 | 3:25 | PM | 16 | 0 | 4 | | VIDEO AVAIL |
| 12TH RED | 1:35:29 | 3:28 | PM | 7 | 0 | 0 | | VIDEO AVAIL |
| 13TH RED | 1:38:16 | 3:31 | PM | 9 | 0 | 2 | | VIDEO AVAIL |
| 14TH RED | 1:41:30 | 3:34 | PM | 9 | 1 | 0 | | VIDEO AVAIL |
| 15TH RED | 1:42:40 | 3:35 | PM | 2 | 0 | 1 | | VIDEO AVAIL |
| 16TH RED | 1:44:56 | 3:37 | PM | 8 | 0 | 0 | | CARRIAGE, VIDEO AVAIL |
| 17TH RED | 1:47:20 | 3:40 | PM | 2 | 0 | 0 | | VIDEO AVAIL |
| 18TH RED | 1:49:56 | 3:42 | PM | 2 | 0 | 0 | | VIDEO AVAIL |
| 19TH RED | 1:51:08 | 3:44 | PM | 1 | 0 | 0 | | VIDEO AVAIL |
| 20TH RED | 1:53:36 | 3:46 | PM | 10 | 0 | 0 | | VIDEO AVAIL |
| 21ST RED | 1:54:56 | 3:47 | PM | 0 | 0 | 0 | | VIDEO AVAIL |
| | | | PM | RED LIGHT | JOGGER LN | PEDICABS | WRONG WAY | NOTES |
| | | | | 156 | 4 | 10 | 0 | |

| RUNNING RED LIGHT ONLY | 156 | | TOTAL |
|---|---|---|---|
| FAILURE TO OBEY TRAFFIC | $190 | 1ST OFFENSE | |
| CONTROL DEVICE | $29,640 | REV/HR | |
| | | | |
| SWERVING INTO JOGGER LANE | 4 | | |
| FAILURE TO USE AND/OR RIDE | $ 115 | 1ST OFFENSE | |
| WITHIN AVAILABLE BIKE LANES | $ 460 | REV/HR | |
| | | | |
| WRONG WAY THRU CROSSWALK | 0 | | |
| WRONG WAY | $ 243 | 1ST OFFENSE | |
| | $ - | REV/HR | |

TOTAL $ 30,100  REV/HR    3 OFFENSES

# SURVEILLANCE STATISTICS

## WEST DRIVE/63RD ST ENTRANCE CROSSWALK

| THIRD HOUR | 9/4/2022 | 1:53+1? PM | | RED LIGHT | JOGGER LN | PEDICABS | WRONG WAY | NOTES |
|---|---|---|---|---|---|---|---|---|
| 1ST RED | 2:03:13 | 3:56 | PM | 7 | 0 | 0 | | NY PARKS ENFORCEMENT, VIDEO AVAIL |
| 2ND RED | 2:05:58 | 3:58 | PM | 13 | 0 | 0 | | NY PARKS ENFORCEMENT, VIDEO AVAIL |
| 3RD RED | 2:07:22 | 4:00 | PM | 4 | 0 | 0 | | NY PARKS ENFORCEMENT, VIDEO AVAIL |
| 4TH RED | 2:10:56 | 4:03 | PM | 9 | 0 | 0 | | CARRIAGE, VIDEO AVAIL |
| 5TH RED | 2:14:50 | 4:07 | PM | 8 | 0 | 0 | | VIDEO AVAIL |
| 6TH RED | 2:20:51 | 4:13 | PM | 7 | 0 | 0 | | VIDEO AVAIL |
| 7TH RED | 2:21:59 | 4:14 | PM | 16 | 0 | 0 | | VIDEO AVAIL |
| 8TH RED | 2:24:34 | 4:17 | PM | 8 | 5 | 1 | | VIDEO AVAIL |
| 9TH RED | 2:29:43 | 4:22 | PM | 5 | 1 | 0 | | VIDEO AVAIL |
| 10TH RED | 2:33:38 | 4:26 | PM | 11 | 0 | 1 | | VIDEO AVAIL |
| 11TH RED | 2:37:59 | 4:30 | PM | 2 | 0 | 0 | | NYPD, VIDEO AVAIL |
| 12TH RED | 2:39:22 | 4:32 | PM | 13 | 1 | 0 | | VIDEO AVAIL |
| 13TH RED | 2:40:28 | 4:33 | PM | 7 | 1 | 0 | 1 | ONLY ON RED LIGHT, VIDEO AVAIL |
| 14TH RED | 2:43:29 | 4:36 | PM | 8 | 0 | 1 | | VIDEO AVAIL |
| 15TH RED | 2:50:16 | 4:43 | PM | 7 | 0 | 0 | | VIDEO AVAIL |
| 16TH RED | 2:53:13 | 4:46 | PM | 6 | 0 | 1 | | VIDEO AVAIL |
| 17TH RED | 2:54:18 | 4:47 | PM | 8 | 0 | 0 | | VIDEO AVAIL |
| 18TH RED | 2:56:08 | 4:49 | PM | 10 | 1 | 2 | | E-UNI, VIDEO AVAIL |
| 19TH RED | 2:57:47 | 4:50 | PM | 8 | 0 | 0 | | VIDEO AVAIL |
| | | | PM | RED LIGHT | JOGGER LN | PEDICABS | WRONG WAY | NOTES |
| | | | | 157 | 9 | 6 | 1 | PARKS ENFORCEMENT PRESENT 4 MIN |

| | | | |
|---|---|---|---|
| RUNNING RED LIGHT ONLY | 157 | | TOTAL |
| FAILURE TO OBEY TRAFFIC | $190 | 1ST OFFENSE | |
| CONTROL DEVICE | $29,830 | REV/HR | |
| | | | |
| SWERVING INTO JOGGER LANE | 9 | | |
| FAILURE TO USE AND/OR RIDE | $ 115 | 1ST OFFENSE | |
| WITHIN AVAILABLE BIKE LANES | $ 1,035 | REV/HR | |
| | | | |
| WRONG WAY THRU CROSSWALK | 1 | | |
| WRONG WAY | $ 243 | 1ST OFFENSE | |
| | $ 243 | REV/HR | |

TOTAL $ 31,108  REV/HR    3 OFFENSES

LAST RED   3:04.34                                                      OUTSIDE OF SCOPE

# SURVEILLANCE STATISTICS

## WEST DRIVE/63RD ST ENTRANCE CROSSWALK

**HOURLY BREAKDOWN**

| | | | | |
|---|---|---|---|---|
| 1ST HR | FAILURE TO OBEY TRAI | 78 | $ 14,820 | NYPD PRESENT 15 MIN |
| 2ND HR | FAILURE TO OBEY TRAI | 156 | $ 29,640 | |
| 3RD HR | FAILURE TO OBEY TRAI | 157 | $ 29,830 | PARKS ENFORCEMENT PRESENT 4 MIN |
| | TOTAL | 391 | $ 74,290 | |
| | AVG/HR | 130.3 | $ 24,763 | |
| | | | | |
| 1ST HR | FAILURE TO USE AND/( | 19 | $ 2,185 | NYPD PRESENT 15 MIN |
| 2ND HR | FAILURE TO USE AND/( | 4 | $ 460 | |
| 3RD HR | FAILURE TO USE AND/( | 0 | $ - | PARKS ENFORCEMENT PRESENT 4 MIN |
| | TOTAL | 23 | $ 5,589 | |
| | AVG/HR | 7.7 | $ 1,464 | |
| | | | | |
| 1ST HR | WRONG WAY | 1 | $ 243 | NYPD THERE 15 MIN, ONLY ON RED LIGHT |
| 2ND HR | WRONG WAY | 0 | $ - | |
| 3RD HR | WRONG WAY | | | PARKS ENFORCEMENT PRESENT 4 MIN |
| | TOTAL | 1 | $ 243 | ONLY ON RED LIGHT |
| | AVG/HR | 0.3 | $ 64 | |
| | | | | |
| 1ST HR | CARRIAGE VIOLATION | 0 | | NYPD PRESENT 15 MIN |
| 2ND HR | CARRIAGE VIOLATION | 3 | | |
| 3RD HR | CARRIAGE VIOLATION | 1 | | PARKS ENFORCEMENT PRESENT 4 MIN |
| | | | | |
| 1ST HR | PEDICAB VIOLATION | 5 | | NYPD PRESENT 15 MIN |
| 2ND HR | PEDICAB VIOLATION | 10 | | |
| 3RD HR | PEDICAB VIOLATION | 0 | | PARKS ENFORCEMENT PRESENT 4 MIN |

# Exhibit B

NY DOT's Commissioner's Customer Service and Correspondence
Unit's written reply on July 13, 2022, to Plaintiff's request for traffic-
calming devices.

 **Gmail**

> **Jerome W. Dewald**
> <jeromekjerome@gmail.com>

# FURTHER FOLLOW-UP: DOT-554564-F3C0 Request for Speed Reducers on Central Park West (West Drive) from West 67 Street to West 63rd Street, Manhattan

2 messages

**Adair, Jessie**                                          Wed, Jul 13, 2022 at 1:39
<JAdair@dot.nyc.gov>                                                       PM
To: Jerome <jeromekjerome@gmail.com>

Hi Jerome,

Below is the response from DOT's speed hump unit:

The answer is not speed humps.  Although the Parks
Department vehicles still use the park drives it is still closed
to all motor vehicle traffic.

His video is showing all the pedestrian and cycling activity.
From what I'm gathering he doesn't like the fact that no
one is utilizing the signals in the park – the cyclists are not
stopping at the red light and the peds are crossing against
the walk signal.  There isn't anything that is going to stop

this from happening now that the park is car-free.  Is he expecting NYPD to stand there and give tickets to cyclists going through red lights and peds for jay walking?  I don't believe there is a design solution for this but copying Sean for any thoughts here as his team was responsible for the markings inside the park drive.

I hope this helps.

Jessie

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message and any attachments are solely for the individual(s) named above and others who have been specifically authorized to receive such and may contain information which is confidential, privileged or exempt from disclosure under applicable law. If you are not the intended recipient, any disclosure, copying, use or distribution of the information included in this message and any attachments is strictly prohibited. If you have received this communication in error, please notify us by reply e-mail and immediately and permanently delete this message and any attachments.

Thank you.

NYC – Department of Transportation

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Jerome**                            Wed, Jul 13, 2022 at 2:47
<jeromekjerome@gmail.com>                                    PM
To: "Adair, Jessie" <JAdair@dot.nyc.gov>

Thanks for all the great work, Jessie!

The bottom line is that this is a dangerous crosswalk, as are
all the crosswalks in the park. It is not about what I do or do
not like. This crosswalk is different from all the other
crosswalks in Central Park because it is within 350 feet of two
schools and the crosswalk is used by hundreds of
children every school day in addition to the elderly and
disabled who use it every day. I am certainly not expecting
NYPD to stand there all day handing out tickets. That's why
we want a traffic-calming device installed there that works
24/7.

There certainly is a design solution here but DOT may have
to take a cue from other cities that have dealt with it. One
idea is rumble strips. I understand from my conversations
with competitive cyclists using this roadway is that Seattle
and Toronto both have speed limiting devices similar to
rumble strips on roadways that are used primarily by bicycles.
These make it very uncomfortable for the rider to move over
them at a high speed.

The American Council of the Blind of NY recently filed and
won a lawsuit against the City of New York and DOT
concerning the crosswalk signals, see SDNY Case No. 18
Civ. 5792. The rationale in this case is exactly the same as
the case I will file if there is no traffic-calming device installed

9/25/22, 12:09 PM          Gmail - FURTHER FOLLOW-UP: DOT-554564-F3C0 R...

there by Labor Day. DOT is obligated under the Americans
with Disabilities Act, to make all of its crosswalks safe for the
disabled, including those in Central Park. The difference here
is that the crosswalks in Central Park are far more dangerous
for blind, disabled, elderly, families and children than are the
ones in the rest of the city. This is easy to show and I now
have far more evidence than I need to file this suit. Let's
please not go this route.

Please send this back to Sean or whoever in DOT designs
and implements solutions for this kind of problem and see if
we can come up with a solution that complies with federal law
by making this crosswalk safe by Labor Day.

Thanks, Jessie.


 Virus-free. www.avg.com

[Quoted text hidden]
--
      s/ Jerome W. Dewald

   read my profile and blog



   make an appointment with me
         https://calendly.com/jeromewdewald

If they give you ruled paper, write the other way.
      -- Juan Ramon Jiminez

Consistency is the last refuge of the unimaginative.
      -- Oscar Wilde

...when you have eliminated the impossible, whatever remains, however
improbable, must be the truth.

# Exhibit C

## Central Park Map



# Exhibit D

"[T]he most dangerous section of Central Park" for pedestrians.

nypost.com

# Pedestrians walking into bicycle danger zones in Central Park

*Daniel Prendergast, Rebecca Harshbarger, Kirstan Conley*

3-4 minutes

The most dangerous section in Central Park for pedestrians is a half-mile stretch of West Drive where 15 people were hit by bikes last year, according to a new city map obtained by The Post.

Twelve of those crashes occurred near the 79th Street Transverse.

"Pedestrians need to act in self-defense," said retired priest Michael McDonnell, 76, of the Upper West Side.

Other hotspots include Center Drive near the 65th Street Transverse, where four people were hit, the DOT map shows.

The intersection of Terrace Drive and East Drive near East 72nd Street also proved to be a hazard, with four crashes there.

"It's dangerous when they're going that fast, and dodging pedestrians," said Jonathan Foster, a 50-year-old from the Upper East Side who likes to both walk and bike in the park.

Collisions between two-wheelers and people walking around the park spiked 31 percent last year, from 29 to 38.

The majority of the crashes in Central Park happened in the southern half of the park — with only six of those collisions above

86th Street.

Last year, the first two people to be struck and killed by bicyclists
in the city since 2009 were struck in Central Park.



Retired physics teacher Irving Schachter, 75, did not survive an
Aug. 3 crash in which he was hit by a cyclist trying to dodge a
pedicab on the East Park loop near 72nd Street.

Jill Tarlov, a 59-year-old Connecticut mom and wife of a CBS
executive, was left brain dead when a speeding bicyclist ran her
down in a crosswalk on West Drive and 63rd Street last
September. She died days later.

A man on a Cervelo racing bicycle hit Elizabeth Reznik, 18, in the
early evening on June 22 on West Drive near 72nd Street,
according to a source.

She suffered a concussion when she smashed her head on the
concrete, as well as bruises and cuts to her arms and legs.

Nina Azour, 59, of the Upper West Side, said she is as
exasperated by rogue bicyclists breaking the law. "It's really
dangerous," she said.

"[Bikes go] the right way, the wrong way, every way."

Cops began slamming the brakes on dangerous bike riders after
the two fatalities with a ticket blitz.

There were over 900 tickets given out in the park in 2014, for

infractions like failing to yield and riding with earbuds.

Almost 350 of the tickets were given out in the five weeks after
Tarlov's death. There were only 215 such summonses written in
2013.

The DOT said the city has lowered the speed limit from 25 to 20
mph in the park. It also slashed speeds to 10 mph at four
pedestrian crossings on East and West Drives.

A barricade was also installed between pedestrian and bicycle
lanes near West 81st Street.

"We'll be taking a close look at the crash rates over the course of
the year, and we'll make adjustments as needed," said DOT
Commissioner Polly Trottenberg. "But I think we've made some
good improvements there.

The city– the Parks Department, NYPD, and DOT– is very
committed to making Central Park a safe and enjoyable
experience for all visitors."

*Additional reporting by Kevin Fasick, Natasha Velez and Jamie
Schram.*

# Exhibit E

Jill Tarlov, 59, struck by a bicycle and killed in the crosswalk

# Husband begs city to stop speeding cyclists after wife dies

*Lia Eustachewich*

The heartbroken husband of the Connecticut mom fatally struck by a speeding bicyclist in Central Park is calling on the city to crack down on cyclists who have turned the urban oasis into a dangerous racetrack.

Calling the situation a "time bomb," Michael Wittman said it's not a matter of if, but when someone else gets hit by a speeding biker.

"It's too little, too late," a still-grieving Wittman told The Post, referring to the city's plan to reduce the speed limit from 25 to 20 mph for cars and bikes.

"You can certainly ride your bike through Central Park — you just can't weave in and out of mothers and strollers at 30 mph. It's pretty clear that these guys race each other through the park every day," the CBS exec said.

His wife, Jill Tarlov, a 58-year-old mother of two, was in the crosswalk at West Drive and 63rd Street on Sept. 18 and about to step onto the curb when cyclist Jason Marshall plowed into her.

Tarlov, who was out shopping for her daughter Anna's birthday, was left brain dead. She died three days later.

"I suspect she was hit from behind and thrown a good distance and hit with pretty good force," said Wittman, who has reviewed the accident report but can't bear to see the autopsy findings. "Doctors told me they've never seen an accident that bad from a bike."



Jason MarshallFacebook

Witnesses told cops that Marshall, 31, was speeding the wrong way down West Drive, yelled at Tarlov to get out of the way, and then tried to swerve around her instead of braking.

"I assume if he were driving a car, he'd be arrested on the spot," Wittman said.

So far, investigators haven't been able to determine how fast Marshall was traveling, even though the avid cyclist obsessively tracked his more than 700 rides this year online — and clocked a top speed of 35.6 mph in Central Park hours before he hit Tarlov.

He told cops at the time he was going only 8 or 9 mph, sources said.

"His statement that he hit her at 8 or 9 mph is highly questionable to me," Wittman said. "I just don't see how that could've happened. He never applied the brakes."

Marshall hasn't been criminally charged, but the Manhattan DA's Office is still investigating.

At the time of the incident, the biker, a studio jazz saxophonist, dismissed it as "an unavoidable accident," and stopped just short of apologizing.

"Since the day of the accident, I and my family have been in constant prayer for her and her family. This is the deepest of pain. It is the deepest of tragedies," Marshall said in a statement.

# Exhibit F

Irving Schachter, 75, died on the Central Park roadway

# Irving Schachter Killed By Cyclist in Central Park Earlier This Month

*By Brad Aaron and Ben Fried*

- 
- Aug 13, 2014
- 77 Comments

A teenage cyclist killed a 75-year-old man jogging in Central Park earlier this month.

At around 4:52 p.m. on Sunday, August 3, Irving Schachter was jogging on the east park loop near 72nd Street when he was hit by a 17-year-old cyclist traveling in the direction of traffic, according to NYPD. Schachter was admitted to New York-Presbyterian/Weill Cornell Medical Center with head trauma. He died on August 5.

According to a post from Schachter's wife Hindy on the New York Cycle Club message board, the cyclist veered into the pedestrian lane on the loop. The crash is under investigation by NYPD's Collision Investigation Squad, and no charges or summonses have been issued yet.

This marks the first time a pedestrian has been killed by a cyclist in New York since 2009, when a wrong-way cyclist in Midtown struck Stuart Gruskin, who, like Schachter, died of head trauma.

Schachter was a long-time member of the NYCC who led rides and was an active cyclist and runner at age 75. He was training for the 2014 New York City Marathon when he was struck.

Hindy Schachter included these words of caution on the NYCC board:

> ...this short message also should remind folks of the cyclist's dual nature. Many of us see cyclists as potential victims of cars. And we are. The city still needs to do much more to secure our safety on Manhattan's streets.  To that end we should support the many Transportation Alternative campaigns.

> But we are also potential predators. One careless move on a bike and we can take down a runner, a walker, a child skipping along.  As we want car drivers to be alert to our rights, so too we must act to protect the rights of other people.